Vasco Rose *v.* State of Connecticut

Superior Court      Fairfield County      File No. 118138
AT Bridgeport

Memorandum filed July 25, 1963

*Philip Reich,* of Bridgeport, for the plaintiff.

*John F. McGowan,* assistant state's attorney, for the state.

FITZGERALD, J.  The plaintiff in the within proceeding is presently imprisoned in the Connecticut state prison at Wethersfield, where he is serving a sentence of not less than twelve years and not more than fifteen years, imposed at a criminal session of this court *(Thim, J.,* presiding) at Bridgeport on November 14, 1961, as an aftermath of his pleading guilty to the crime of manslaughter resulting from a shooting episode in Bridgeport on July 2, 1961, which cost the life of another man.  The complaint or petition upon which the plaintiff stands before the court has been described by his counsel as a bill in equity partaking of some of the attributes of a complaint in a habeas corpus proceeding.  It occurs to the court that it could equally as well be described as a complaint having as its objective declarations in the nature of a complaint seeking a declaratory judgment.  In its answer, the defendant does not raise any technical objections to the form of the complaint or to the manner and method adopted in bringing the proceeding before the civil side of court for an adjudication.

The complaint comprises ten enumerated paragraphs; the defendant in its answer admits the

allegations contained in the first four of such paragraphs and in effect denies the allegations in the remaining paragraphs. Those paragraphs of the complaint and the allegations therein which have been denied by the defendant give rise to the basic question whether certain proceedings on the criminal side of this court which culminated in the sentence imposed on November 14, 1961, were null and void as being in violation of the rights of the plaintiff under specified provisions of the constitution of the United States and the constitution of Connecticut.[1] It is the plaintiff's claim that such was the situation. In his prayer for relief, he requests that the proceedings had on October 18 and November 14, 1961, on the criminal side of this court, "be set aside, canceled, erased, and be declared null and void and that such further proceedings be taken as are in accordance with the law."

Paragraph 5 of the complaint in its original form reads: "Between the date September 26, 1961, when the plaintiff pleaded Not Guilty to the crime of Murder in the 2nd degree and the date October 18, 1961, when the plaintiff pleaded Guilty to having committed the crime of manslaughter various representations were made to the plaintiff and inducements offered to the plaintiff to induce him to so change his plea." To the subject of that paragraph, and before filing its answer to the complaint, the defendant directed a motion for more specific statement, which the court *(Palmer, J.)* ordered granted

---

[1] Paragraph 10 of the complaint reads: "The proceedings in the Superior Court for Fairfield County on the 18th day of October, 1961, referred to in paragraph three hereof, and the proceedings in said Superior Court on the 14th day of November, 1961, referred to in paragraph four hereof, were a nullity and were void; and said proceedings were in violation of the Constitution of the United States including Articles 5, 6 and 14 of the Amendments thereto; and said proceedings were further in violation of the Constitution of the State of Connecticut including Article First, Sections 9, 10 and 21 thereof."

on March 15, 1963. In compliance therewith, the plaintiff filed a more specific statement to that paragraph, setting forth that the inducements and representations therein referred to were made by John F. James, his then attorney, and by Otto J. Saur, state's attorney for Fairfield County; that such were made at the office of the state's attorney and at the state jail in Bridgeport; and that they were made orally.

During the trial of the within proceeding, which occupied three days last June exclusive of time devoted to summations, the plaintiff's present attorney, Philip Reich, conceded that it is not his claim that Saur, as state's attorney or in any other capacity, or that anyone connected with the state's attorney's office, made any representations or commitments to anyone in regard to the subject matter of paragraph 5 of the complaint in its original form or as amended by the more specific statement thereto as on file. The effect of this concession by Reich, in the nature of an oral amendment to the more specific statement filed by the plaintiff on April 6, 1963, is that the representations made to the plaintiff between September 26 and October 18, 1961, as alleged in paragraph 5 of the complaint as now amended, can only be referable to James, who at that time was the plaintiff's attorney, and not to anyone connected with the prosecution of the criminal case. That neither Saur nor any of his assistants ever talked with the plaintiff in regard to a disposition of the criminal case is likewise conceded by Reich.

However, Reich on behalf of the plaintiff does not retrench from the allegation of inducement on the part of the state's attorney, extending to the plaintiff, which influenced the latter to plead guilty to manslaughter. Since it is conceded that no representations or commitments were made by the state's attorney or by anyone connected with his office in

regard to the plaintiff's pleading guilty to manslaughter, the continued assertion of inducement charged against the state's attorney is bizarre. This aspect will be considered later from a factual and legal standpoint.

Parenthetically, it is noted that on March 26, 1963, at Christiansted, St. Croix, in the Virgin Islands, James gave testimony by deposition which forms a part of the record in this proceeding. He is now living in the Virgin Islands, where he intends to practice law. This was done at the instance of the plaintiff. The examining attorneys were Philip Reich for the plaintiff and John F. McGowan, assistant state's attorney for Fairfield County, for the defendant. They are the participating attorneys for the respective parties throughout the within proceeding.

The allegations of the plaintiff's complaint which have been admitted by the defendant in its answer may be briefly summarized. On September 26, 1961, a grand jury at Bridgeport in Fairfield County indicted the plaintiff for the crime of murder in the second degree and charged that on July 2, 1961, at Bridgeport, with malice aforethought, he did shoot and kill one Harold Whitson, also known as Frank "Blue" Johnson; that thereafter on that day the plaintiff was presented before the criminal side of this court at Bridgeport and pleaded not guilty; that on October 18, 1961, the plaintiff was again presented before the court and changed his plea to that of guilty to the charge of manslaughter in connection with the homicide referred to in the indictment of September 26, 1961; and that on November 14, 1961, the court imposed sentence upon the plaintiff to serve a term of not less than twelve years and not more than fifteen years in the Connecticut state prison at Wethersfield as punishment for the crime of manslaughter.

While the complaint does not so allege, the fact is that the plaintiff in pleading not guilty to the indictment of murder in the second degree on September 26, 1961, had elected to be tried to a jury. The presiding judge holding the criminal session of this court at Bridgeport at all times referred to in the complaint, and who imposed the sentence now sought to be vacated, was the Hon. John R. Thim. In passing, reference is made to the penalties set by statute for murder in the second degree and for manslaughter. As to the first crime mentioned, the penalty is life imprisonment; General Statutes § 53-11; and as to the second, a fine of not more than $1000 or imprisonment of not more than fifteen years or both. § 53-13. In passing, it is also noted that following the imposition of sentence on November 14, 1961, the plaintiff through James filed an application for review and reduction of the sentence by the Review Division of the Superior Court, which is composed of three judges of that court appointed by the chief justice. This is a procedure which has been authorized by statute in Connecticut since 1957. General Statutes §§ 51-194—51-196. By memorandum released on May 29, 1962, the sentence imposed was unanimously affirmed by the division.

It is neither the function nor the prerogative of this court, sitting as a civil court although possessing certain equitable powers, to attempt to determine whether the grand jury on the evidence presented before it properly returned an indictment of murder in the second degree against the plaintiff on the criminal side of this court, or whether upon a trial to the petit jury the plaintiff would have been acquitted of any criminal involvement in the fatal shooting of Harold Whitson. Nor can this court reduce the sentence imposed even though it felt that it was more severe than the circumstances justified. This is because the decision of the Review

Division by statute (§ 51-196) is made final. All that this court may do is to determine whether one or more constitutional rights of the plaintiff have been violated or whether he has been deprived of one or more constitutional safeguards. As stated in the second paragraph of this memorandum, these are the plaintiff's claims.

That a pistol in the hand of the plaintiff discharged a bullet into the neck of Whitson on the morning of Sunday, July 2, 1961, at about 9 o'clock, which caused his death an hour or so later, is not disputed. The plaintiff was thirty-seven years old at the time. Since his youth, he has made his living as a professional gambler. Dice games were his specialty. For several hours prior to the fatal shooting, the plaintiff and others had been engaged in a series of dice games at an establishment known as Brother Hall's, located on Drouve Street in Bridgeport. Whitson was in the room where the gambling was taking place. In the course of those several hours, the plaintiff lost about $1300 to one other than Whitson. An argument ensued which appears to have involved the plaintiff and Whitson. It was resumed outside of the establishment and the shooting then occurred. It is to be noted that the foregoing recital omits controversial claims of fact between the state on the one hand and the plaintiff as the accused in the criminal proceeding.

At the trial of this proceeding, the transcript of the statement of James to the court on the day of sentence was introduced as an exhibit by agreement of counsel. The statement of Saur to the court was not introduced other than his concluding remark in his opening statement, which was, "I urge upon your Honor most strongly to send him [the plaintiff] to that institution [state prison] for a substantial period of time." So, also, the remarks of the court

addressed to counsel during their statements and at the time that sentence was imposed are not before this court as an exhibit.

In mid-August, 1961, James agreed to act as attorney for the plaintiff in his private capacity and not as public defender, a position he then occupied on the criminal side of the Superior Court in Fairfield County. Following the plaintiff's indictment for murder in the second degree, James went to Saur in the latter's capacity as state's attorney to ascertain if the charge against the plaintiff could be reduced to that of manslaughter. At that time and during all later conferences, Saur was emphatic in his statement that he considered the criminal case against the plaintiff to be a strong one. In regard to the murder indictment, he voiced confidence that the plaintiff would be convicted by the petit jury. No agreement was reached on a reduction of charge at the first conference. After James had discussed further the situation with the plaintiff, and in a later conference with Saur, the latter agreed to reduce the charge to manslaughter upon a plea of guilty to that charge.

The court was so informed on October 18, 1961, and the plaintiff so pleaded. As appears from defendant's exhibit 1, the following thereafter transpired: The court *(Thim, J.):* "You have been represented during the proceedings by counsel?" Mr. Rose: "Yes." The court: "You have consulted with counsel?" Mr. Rose: "Yes." The court: "You understand that you are pleading guilty to manslaughter and that is what you have just stated, is that correct?" Mr. Rose: "Yes." Mr. Saur: "May this matter be continued?" The court: "Plea may be accepted."

At no time did Saur agree to recommend to the court the kind of sentence to be imposed. The

position which he consistently took with James was that he would ask the court to impose a substantial prison term. And as already noted, he so requested the court on November 14, 1961, when sentence was imposed. It appears from the transcript of the statement of James to the court on the day of sentence that he fervently pleaded for a suspended sentence and probation, and the reasons advanced. The kind of sentence imposed by the court would conclusively indicate that the presiding judge was not impressed by what appears to have been an impassioned plea of clemency made by James on behalf of the plaintiff. As stated earlier, the kind of sentence imposed, even if considered unduly severe by this court (and no opinion on this aspect is expressed), is not a factor involved in this proceeding.

In his deposition, taken at St. Croix in the Virgin Islands on March 26, 1963, James acknowledged that he strongly urged the plaintiff to plead guilty to manslaughter. The reasons he advanced were that he was convinced, after having interrogated various witnesses at the scene of the shooting, that the plaintiff would be convicted on the indictment of murder in the second degree and would come out of the trial with a mandatory life sentence. In that deposition, James stated that the plaintiff expressed confidence in his acquittal on the murder charge and was reluctant to plead guilty to the lesser charge but did so upon his advice. That the plaintiff on some two or three occasions changed his mind in regard to pleading guilty to manslaughter before so pleading in open court on October 18, 1961, is borne out by James in his deposition.

In his testimony, the plaintiff would have it appear that James prevailed upon him to plead guilty to manslaughter because of the following statements made to him, among others: That James

and the judge spoke the same language; that the judge would view the shooting as an accident and negligence and that he (James) would make him see it that way; that at the very most the maximum sentence would not be more than five years. In this connection, general reference is made to letters written by the plaintiff and James to each other between June 25, 1962, and August 6, 1962, marked as plaintiff's exhibits at the taking of the deposition, and remarked as defendant's exhibits at the trial in June.

In his deposition and in his correspondence with the plaintiff, James makes it clear that he was astounded by the severity of the sentence. While the plaintiff's prior criminal record was not offered in evidence, it was made to appear that he did have such a record, which for the most part, if not entirely, consists of the commission of misdemeanors over the years. It is the considered opinion of the court that the plaintiff's grief and chagrin are occasioned by the long sentence imposed. The court will accept as a fact that the plaintiff had confidence that James at least would be successful in obtaining for him a comparatively short prison term, regardless of what would be the position of the state's attorney in opposition.

The one criticism that the court makes of James, if criticism is to be made, is that he did not acquaint the plaintiff with one item of information. Had the plaintiff stood trial for second degree murder and been convicted, the mandatory sentence of life imprisonment could have eventually resulted in a parole after a period of twenty years. General Statutes § 54-125. But that apart, under the sentence of twelve to fifteen years which the plaintiff is now serving, he could earn a commutation of more than two years on the specified minimum of twelve years by good conduct as a prisoner. General Statutes

§ 18-7. Viewed from this standpoint, the plaintiff is better off than he would have been if convicted of second degree murder, unless he was acquitted of that charge. While the outcome of a trial on the indictment of murder in the second degree cannot be predicted with certitude, the plaintiff's attorney at that time, in the person of James, an experienced criminal lawyer, was of the opinion that there would be a conviction, and the state's attorney at all times considered that he had a strong case which would result in a conviction. Granting that both attorneys could be wrong, it could also be that they were right in their diagnosis of the situation. Each was a specialist in his respective field. And the court cannot find that either was influenced by considerations other than to best serve the interest which each represented. A lawyer for the defense and a lawyer for the prosecution can do no more.

As to those allegations of the complaint which recite that the plaintiff at the time of his change of plea was emotionally and mentally disturbed and did not have adequate comprehension of the nature of his act, the court has no hesitation in finding such allegations not proven, with this comment: Since the plaintiff had taken the life of a fellow human being and faced an uncertain future, it is to be expected that he would be nervous, suffer loss of appetite, and have difficulty in sleeping. That his mind and power of reason were thereby affected does not find support in the evidence. It is true that the plaintiff for some few years prior to the fatal shooting had what is known as a nervous stomach. Naturally, the dilemma which confronted him after that episode did not improve his stomach. It is also true that he lost weight between the time he was first confined to jail on July 2, 1961, and the date of his change of plea. So also it is true that he was given medication at the jail for his stomach dis-

order, but these ministrations were stopped on various occasions at his own request. The conjectural medical testimony before the court that such medications had a disturbing effect upon the plaintiff and tended to reduce his will power cannot be credited. Although the plaintiff has had only seven years of formal education, he can read and write without difficulty; an intelligence test has established that he possesses normal intelligence. As a witness he was well-spoken. That at times he had trouble as a witness in remembering dates or the meaning of certain words could be ascribed to nervousness or to causes other than mental deficiency. As stated, it appears that he does have normal intelligence, and no claim to the contrary is made.

In support of his position that the proceedings on the criminal side of this court on October 18 and November 14, 1961, "be set aside, canceled, erased, and be declared null and void" on constitutional grounds, counsel for the plaintiff cites the following cases: *Smith* v. *O'Grady,* 312 U.S. 329 (1941); *United States* v. *Davis,* 212 F.2d 264 (1954); *Euziere* v. *United States,* 249 F.2d 293 (1957); *United States* v. *Tateo,* 214 F. Sup. 560 (1963). In keeping with the pattern of these cases, the court cites the most recent decision by the United States Supreme Court in the case of *Machibroda* v. *United States,* 368 U.S. 487 (1962). On their facts, these cases are not viewed as pertinent to the basic question presented in the within proceeding.

In the *Smith* case, the petitioner, who was an uneducated man and not represented by an attorney, and who was unfamiliar with legal procedure, was tricked by state officers in pleading guilty to a serious criminal charge and had imposed upon him a prison term of twenty years. In the *Davis* case, the petitioner pleaded guilty to a criminal charge because of misrepresentations of his attorney as to

the nature of the charge. In the *Euziere* case, the petitioner pleaded guilty to a criminal charge because the trial judge stated before trial that if he was found guilty the maximum sentence provided by law would be imposed because the government had been put to the expense of a trial. In the *Tateo* case, the situation also concerned remarks of the trial judge which resulted in the petitioner's attorney urging the petitioner to plead guilty to a criminal charge, which he did. In the *Machibroda* case, the petitioner had imposed upon him a prison term of twenty-five years on the first information and fifteen years on the second, to run consecutively. Thereafter, he filed a motion to set aside the sentences which was overruled by the trial court, and that ruling was affirmed by the Court of Appeals. An affidavit in support of the motion stated that an assistant of the United States attorney promised the petitioner that if he pleaded guilty to the pending criminal charges he would receive a total prison term of not more than twenty years, stating further that the promise was authorized by the United States attorney and was agreeable to the trial judge. The Supreme Court on appeal remanded the case for hearing on the petitioner's motion, with the comment (p. 496): "There will always be marginal cases, and this case is not far from the line. But the specific and detailed factual assertions of the petitioner, while improbable, cannot at this junction be said to be incredible. If the allegations are true, the petitioner is entitled to relief."

The favorable results obtained by the petitioners in the foregoing cases, and in all instances except one they came about only on appeal to a higher tribunal, are in keeping with basic principles of American law and justice and constitutional guarantees. However, all of those cases involve facts which are not analogous to those in the within proceeding.

The last case cited *(Machibroda)* simply stands for the proposition that the petitioner should have his day in court to prove the allegations of his motion. In the within proceeding, the plaintiff has been accorded that right.

It cannot be found that inducements or representations by James in the true meaning of these words caused the plaintiff to plead to a lesser offense than murder in the second degree under such circumstances as to taint and make void the plea of guilty to manslaughter on October 18, 1961, and the subsequent sentence of the court on November 14, 1961. That James was confident that the penalty to be imposed would be at the most modest is implicit in his statement to the court for clemency. A reading of the context of that statement confirms what he told the plaintiff his approach to the question of penalty would be in his address to the court. So, also, it cannot be found that James acted other than in good faith and upon what he considered the best interest of his client, the plaintiff, dictated. In saying to the plaintiff that he and the presiding judge spoke the same language, his meaning clearly was that he was confident that the judge would see matters in regard to penalty as he orally presented them in his statement to the court. For the plaintiff to attempt to place another interpretation upon this figure of speech only indicates the extreme to which he would go in shedding a sentence that he, and doubtless others, considers to be on the severe side. The Review Division, which had before it the entire record of the case, including the presentence investigation report required by law, would have reduced the sentence if it considered that such should be done in the interest of justice.

It has been noted earlier that Reich does not now claim that Saur, the state's attorney, or anyone connected with his office, made any representations or

commitments to anyone, anywhere, in regard to the plaintiff's plea of guilty to the lesser crime of manslaughter. From beginning to end, Saur consistently stated that he would urge the court to impose a substantial sentence, and he did so. To say that anything done by the state's attorney was an inducement to the plaintiff to plead, so as to vitiate and make void that plea on constitutional grounds, is shocking. Granting that the change of the charge of murder in the second degree to that of manslaughter was on the condition that the plaintiff plead guilty to the latter, the fact remains that the reduced charge was of lesser magnitude from the standpoint of penalty. For all that appears, the state was prepared to proceed with the trial on the indictment. It was not the state's attorney who made the overtures of reduction of the crime of murder in the second degree charged in the indictment of the grand jury. Furthermore, it is found that the plaintiff's plea of guilty to the reduced charge of manslaughter was voluntary and not the result of coercion within the meaning of the law, and that when the plea was made he knew and comprehended what he was doing. As pointed out earlier, and as appears from the defendant's exhibit 1, the court inquired of him at the time of plea if he had consulted with his attorney, and if he understood that he was pleading guilty to manslaughter. To both questions the plaintiff answered in the affirmative.

Further discussion is not required other than to say that this court does not find that James was a hostile witness to the plaintiff at the taking of his deposition in the Virgin Islands. During the trial, Reich asked that the court make a finding one way or the other on this aspect. The court has done so in the manner indicated.

In this proceeding, the issues are required to be, and are, found for the defendant state of Connecti-

cut and against the plaintiff. Judgment may so enter. In conclusion, the efforts of the participating counsel in this proceeding are commended. Each gave of his best, and are deserving of this commendation by the court.